TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00184-CV








Basic Capital Management, Inc.
, Appellant


v.



Dow Jones & Company, Inc., d/b/a The Wall Street Journal
, Appellee








FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GN003093, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING






 In this defamation suit filed by appellant Basic Capital Management, Inc. ("BCM")
against Dow Jones & Company, Inc., doing business as The Wall Street Journal, we address whether
statements in articles published by Dow Jones characterizing a federal indictment are substantially
true and therefore not actionable. The district court granted summary judgment in favor of Dow
Jones, dismissing BCM's claims of libel and business disparagement. On appeal, BCM challenges
the granting of summary judgment, contending that Dow Jones failed to establish that (i) the
complained-of statements were true or substantially true, (ii) BCM was a public figure, and (iii) Dow
Jones was not negligent. Because we conclude that the statements characterizing the indictment
were substantially true as a matter of law, we affirm the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

The Indictment

 On June 14, 2000, the United States Attorney's Office for the Southern District of
New York unsealed indictments alleging that members of the five largest crime families in New
York, along with other individuals in various parts of the country, engaged in a massive conspiracy
to manipulate stock prices. The 107-page indictment at issue here alleged that twenty-three
defendants associated to form a racketeering enterprise that engaged in "securities fraud, wire fraud,
pension fund fraud, illegal kickbacks to union officials, extortion, money laundering, bribery, witness
tampering, and murder solicitation." Count One of the indictment described the "means and
methods" of the enterprise, alleging that the defendants sought to enrich the enterprise through
securities fraud and wire fraud, and to conceal and promote the enterprise's unlawful activities by
laundering proceeds of the scheme.

 Although BCM, a Dallas real estate investment firm, was not a named defendant, it
was identified as an actor in a pension fund fraud and kickbacks scheme set forth in Count One of
the indictment. Specifically, the indictment identified a stock offering by American Realty Trust,
a real estate investment trust controlled by BCM, as a "fraudulent investment[] that appeared to be
[an] investment[] suitable for pension funds and that w[as] designed to appear legitimate." The
indictment further alleged that BCM "agreed with the enterprise to cause American Realty Trust to
issue a series of preferred stock" and "further agreed with the enterprise" that for every $10 million
in stock sales, BCM "would cause approximately $2 million of the proceeds to be paid secretly to
the enterprise."

 Included in the list of the twenty-three defendants were Gene Phillips and A. Cal
Rossi, who the indictment identified as associated with BCM. The indictment alleged that Gene
Phillips "secretly controlled" BCM and agreed with members and associates of the enterprise "to
defraud union pension funds in connection with the sale of American Realty preferred stock." The
indictment further alleged that Cal Rossi, as managing director of capital markets for BCM,
"structured the fraudulent . . . [s]tock offering" and "agreed that a portion of the offering proceeds
would be used to pay secret bribes to union officials." Phillips and Rossi were named as defendants
in several counts of the indictment, including Count One.


The Wall Street Journal Articles

 On June 15, the day after the indictments were unsealed and arrests were made, the
Journal ran the first of three articles that named BCM and discussed the allegations contained in the
indictment. On June 20 and June 27, following press releases issued by BCM, the Journal ran
follow-up articles. (1)


 June 15

 In its "Heard on the Street" column, the Journal published an article entitled "Stock-Fraud Case Alleges Organized-Crime Tie" and "Prosecutors Say Stocks Of 19 Firms Were
Manipulated." Reporting on the charges against 120 defendants, the article described "the largest
one-day securities-fraud indictment ever," alleging various stock manipulation schemes involving
microcap stocks and "dot.coms." Recounting a scheme in the indictment to issue fraudulent stock
and pay kickbacks to corrupt union officials, reporters for the Journal wrote:


The mob's alleged racketeering enterprise also sought to defraud union pension funds
by structuring investments that allowed for secret kickbacks to corrupt union
officials, the charges said. One of them, officials said, was a preferred stock offering
of American Realty Trust, a real-estate investment trust listed on the New York Stock
Exchange, allegedly arranged through Gene Phillips, who controlled Basic Capital
Management, the Dallas investment adviser to the REIT.


In a statement, Basic Capital, which manages $2.5 billion and advised four publicly
traded real-estate companies, said Mr. Phillips and another key executive were "out
of the country," one on vacation and the other on business. "We are shocked and
surprised" by the news, the company said.



 June 20

 Stock in publicly traded companies affiliated with BCM fell sharply after the
indictment was released. As a result, BCM received margin calls, then on June 19 issued a press
release that it might default on $37 million in obligations. An assistant reporter with the Journal's
Dallas bureau received the June 19 press release about the margin calls. She called BCM for an
interview, but its director of investor relations said that no one would be made available for
comment. The reporter began to draft an article based on the press release, then read other news
stories for background information. Another newspaper characterized the indictment as alleging that
"two Dallas men were to launder bribe money and kickbacks that went to pay corrupt union officials
and mobsters." (2)

 The Journal ran the article on June 20. Appearing on page A10, the article, entitled
"Basic Capital Reports It Is Likely To Default On Its Margin Calls," contained the following
statement: "Federal authorities allege that the enterprise laundered most of its bribe money through
Basic Capital Management."


 June 27

 The reporter wrote another article after receiving a June 26 press release from BCM. 
In its press release, BCM stated that it was making progress in margin debt restructuring. Appearing
on page C8, the article was entitled "American Realty, Basic Capital Reach Agreements On Debt." 
It summarized the press release and contained a statement that "two men associated with Basic
Capital were charged with participating in a moneylaundering scheme with alleged mob ties."


 July 12

 Complaining about the June 20 article, BCM's general counsel sent a letter on June
29 to the managing editor of the Journal asking for a correction. He wrote: "there has been
absolutely no allegation made by Federal authorities . . . that Basic Capital or any of its officers,
directors or employees ever laundered money for anyone." The Journal issued a correction on July
12, stating that "[t]wo of Basic Capital Management's former advisers who resigned last month were
charged with wire fraud and conspiring to pay illegal kickbacks through Basic Capital Management,
but were not charged with money laundering."


The Lawsuit

 BCM filed suit against Dow Jones for defamation and business disparagement,
alleging that the two statements in the June 20 and June 27 articles falsely stated that BCM was
involved in money laundering. BCM did not challenge the June 15 article. Dow Jones filed a
traditional motion for summary judgment on the grounds that the articles were not libelous because
they were true or substantially true, BCM was a public figure for the purposes of the suit, and BCM
could not prove actual malice or negligence as a matter of law. The district court granted the motion
for summary judgment without specifying the ground and rendered judgment in favor of Dow Jones.


ANALYSIS

 The standard for reviewing a motion for summary judgment is well established: (i)
The movant for summary judgment has the burden of showing that no genuine issue of material fact
exists and that the movant is entitled to judgment as a matter of law; (ii) in deciding whether there
is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and (iii) every reasonable inference must be indulged in favor of the
non-movant and any doubts resolved in its favor. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546,
548-49 (Tex. 1985). When a defendant seeks to obtain summary judgment based on a plaintiff's
inability to prove its case, the defendant must conclusively disprove at least one element of each of
the plaintiff's causes of action. Tex. R. Civ. P. 166a(c); Huckabee v. Time Warner Entm't Co., 19
S.W.3d 413, 420 (Tex. 2000). Once the movant establishes that it is entitled to summary judgment,
the burden shifts to the non-movant to show why summary judgment should not be granted. See
Casso v. Brand, 776 S.W.2d 551, 556 (Tex. 1989). Because the trial court's order does not specify
the ground or grounds relied on for its ruling, we will affirm the summary judgment if any of the
theories that Dow Jones advanced are meritorious. See Carr v. Brasher, 776 S.W.2d 567, 569 (Tex.
1989).

 BCM alleges in its first issue that Dow Jones did not establish as a matter of law that
the statements in the June 20 and June 27 articles were true or substantially true. BCM further
contends that the June 20 statement, that "Federal authorities allege that the enterprise laundered
most of its bribe money through Basic Capital Management," and the June 27 statement, that "two
men associated with Basic Capital were charged with participating in a moneylaundering scheme
with alleged mob ties," were neither true nor substantially true, because BCM was not named as a
defendant and was not mentioned as a participant in a money-laundering scheme. BCM contends
that the false reporting harmed its reputation. Because the parties agree that the challenged
statements only characterize the allegations of the indictment, and do not purport to portray the
underlying events described therein, our task is necessarily limited to determining whether the
articles accurately report the charges set forth in the indictment.

 To prevail on a defamation claim, the plaintiff must prove that the defendant
published a statement that was defamatory about the plaintiff, while acting with either actual
malice--if the plaintiff was a public official or public figure--or negligence--if the plaintiff was
a private individual--about the truth of the statement. WFAA-TV, Inc. v. McLemore, 978 S.W.2d
568, 571 (Tex. 1998). A written statement is defamatory if it exposes a person to public contempt
or financial injury, or if it impeaches a person's reputation. See Tex. Civ. Prac. & Rem. Code Ann.
§ 73.001 (West 1997). To prevail on a business disparagement claim, the plaintiff must prove
publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special
damages. Prudential Ins. Co. of Am. v. Financial Review Servs., Inc., 29 S.W.3d 74, 82 (Tex. 2000). 
 A statement that is true or substantially true cannot support a claim for either
defamation or business disparagement. See Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766
(Tex. 1987). Therefore, if Dow Jones shows the substantial truth of the articles as a matter of law,
it will be entitled to summary judgment. See McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex. 1990).

 The substantial truth test stems from the freedom of speech and freedom of press
protections of the First Amendment. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991). Under the substantial truth test, the truth of the statement in the publication on which an
action for libel is based is a defense to the action. McIlvain, 794 S.W.2d at 15; see also Tex. Civ.
Prac. & Rem. Code Ann. § 73.005. A statement is substantially true, and thus not actionable, if its
"gist" or "sting" is not substantially worse than the literal truth. See McIlvain, 794 S.W.2d at 16;
Dolcefino v. Randolph, 19 S.W.3d 906, 921 (Tex. App.--Houston [14th Dist.] 2000, pet. denied). 
This evaluation requires us to determine whether, in the mind of the average person who read the
statement, the allegedly defamatory statement was more damaging to the plaintiff's reputation than
a truthful statement would have been. McIlvain, 794 S.W.2d at 16; Dolcefino, 19 S.W.3d at 921. 
When the underlying facts as to the gist of the libelous charge are undisputed, we disregard any
variance regarding items of secondary importance and determine substantial truth as a matter of law.
McIlvain, 794 S.W.2d at 16.


 The June 20 Article

 We first examine whether the June 20 article is true or substantially true in stating that
the indictment alleges that the racketeering enterprise laundered bribe money through BCM. BCM
urges that the statement is false because the indictment does not allege that BCM, Phillips, or Rossi
participated in the money-laundering scheme. BCM also argues that the gist of the accusation of
money laundering is more damaging to BCM's reputation in the mind of the average reader of the
Journal than a truthful statement would have been. We disagree with both contentions. 

 As the substantive racketeering count of the indictment, Count One defines the
racketeering enterprise and names twenty-three defendants, including Phillips and Rossi. In addition
to describing the money-laundering and kickback schemes engaged in by the enterprise, Count One
recites the purposes of the enterprise to include "concealing and promoting the enterprise's unlawful
activity by laundering the proceeds of securities fraud and wire fraud." While the indictment does
not name BCM as a defendant, it also does not suggest that the company played a passive role. 
According to Count One of the indictment, BCM "agreed to cause" the issuance of stock and
"further agreed with the enterprise" that for every $10 million in stock issued, it would "cause
approximately $2 million of the proceeds to be paid secretly to the enterprise."

 The crime of racketeering includes a pattern of illegal activity that encompasses a
wide range of crimes, including, inter alia, bribery, money-laundering, extortion, embezzlement,
wire and mail fraud, gambling, and murder. See 18 U.S.C. § 1961(1). Here, Count One sets forth
a panorama of nineteen racketeering acts that include, inter alia, securities fraud, extortion, money-laundering conspiracies, kickback schemes, wire fraud, and witness tampering. While the article
could have been more precise in describing BCM's alleged role, it accurately depicted the allegations
of the indictment that the enterprise engaged in money laundering and that the bribe moneys, i.e.,
kickbacks, were obtained--as it was alleged--through the issuance of fraudulent stock by BCM and
a second fraudulent investment known as the TradeVentureFund, which was unrelated to BCM. The
article was clear that the indictment did not name BCM as a defendant. Moreover, as described in
the article, BCM's role was as consistent with the company being an unwitting conduit as with being
a knowing participant. 

 BCM argues that a statement suggesting that BCM was engaged in money laundering
would be more damaging to BCM's reputation because of the opprobrium associated with money
laundering as well as the availability of forfeiture as a penalty under the federal crime of money
laundering. An ordinary reader of the Journal, BCM asserts, could reasonably believe from the
article that BCM was at risk for a multimillion-dollar forfeiture.

 The taint of the alleged defamatory statement is certainly no greater in the mind of
the average reader than a more exacting truthful statement would have been. An ordinary reader
could well conclude that the description of BCM as a money-laundering conduit carries less "sting"
than the portions of the indictment that actually mention BCM's role. In the plain words of the
indictment, BCM was alleged to be an active participant in the charged conspiracy. 

 Moreover, because of the broad availability of forfeiture in RICO (3) cases, BCM was
no more exposed to forfeiture for alleged money laundering than it would be for the activities
actually alleged in the indictment. RICO provides specifically that a defendant convicted of a
violation of the Act "shall forfeit to the United States . . . any interest the person has acquired or
maintained in violation of section 1962 [and] any property constituting, or derived from, any
proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful
debt collection in violation of section 1962." 18 U.S.C. § 1963(1), (3). Courts have held that the
statute creates a mandatory obligation of forfeiture after a RICO conviction. See, e.g., United States
v. Faulkner, 17 F.3d 745, 774-75 (5th Cir. 1994). Thus, the indictment itself raised the specter of
forfeiture of any interests of convicted defendants.

 A comparison of the challenged statement and the indictment demonstrates that the
article was substantially true and not inaccurate, and that any variance was minor. See McIlvain, 794
S.W.2d at 16.


 The June 27 Article

 The June 27 article, as with the June 20 article, arose from a BCM press release. The
article reported information from the press release that BCM had avoided threatened margin calls. 
It also included background information about the indictment. The allegedly defamatory statement,
that "two men associated with Basic Capital were charged with participating in a moneylaundering
scheme with alleged mob ties," is true or substantially true. That Phillips and Rossi were associated
with BCM was clear from BCM's own press release that Phillips and Rossi "stepped aside" from
their "day-to-day responsibilities" with the company. Phillips was active in the management of the
company, and Rossi was director of capital markets for BCM.

 Phillips and Rossi were charged in Count One of the indictment as members of the
enterprise, which included members of organized crime families. Count One, a forty-seven page
description of the racketeering scheme, listed the "means and methods of the enterprise," including
money laundering, union pension fund fraud, and kickback schemes. Additionally, the indictment
alleged that Phillips "agreed . . . to defraud union pension funds" and that Rossi structured the stock
offering and "agreed that a portion of the proceeds would be used to pay secret bribes." The
allegations of the indictment thus fall under the ambit of participating in a money laundering scheme,
which includes disguising illegally obtained funds so that the funds appear to come from legitimate
sources or activities. See 18 U.S.C. § 1956. Money laundering occurs in connection with a wide
variety of crimes, including fraud and racketeering. See id. Because the gist or sting of the statement
characterizing the indictment in the June 27 article is not worse than the literal truth, the statement
is substantially true as a matter of law. See McIlvain, 794 S.W.2d at 16. We overrule BCM's first
issue. (4)


CONCLUSION

 We conclude that the statements characterizing the indictment in the June 20 and June
27 articles are substantially true as a matter of law. Because Dow Jones has negated an essential
element of BCM's causes of action, we affirm the judgment of the district court granting summary
judgment in favor of Dow Jones.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Patterson and Puryear

Affirmed

Filed: October 17, 2002

Publish
1. BCM challenges statements contained in the June 20 and June 27 articles, but none in the
initial article on June 15.
2. At oral argument, counsel for BCM advised that BCM did not file a lawsuit against the
other newspaper.
3. RICO is an acronym for the Racketeer Influenced and Corrupt Organizations Act. See, e.g.,
United States v. Cantu, 185 F.3d 298, 300 (5th Cir. 2000).
4. In light of our disposition of BCM's first issue, we need not address its remaining issues.